## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**S.M.S.R.** and **R.S.P.S.**,
*on behalf of themselves and all others similarly
situated*;

**Capital Area Immigrants' Rights Coalition,**
1612 K Street NW, #204
Washington, DC 20006;

**Refugee and Immigrant Center for Education
and Legal Services, Inc.,**
1305 North Flores Street
San Antonio, TX 78212;

Plaintiffs,

v.

**Donald J. Trump,** in his official capacity as **President
of the United States,**
1600 Pennsylvania Avenue, N.W.
Washington, DC 20500;

**Matthew Whitaker,** in his official capacity as **Acting
Attorney General of the United States,**
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530;

**Kirstjen M. Nielsen**, in her official capacity as
**Secretary of Homeland Security,**
25 Murray Lane SW
Washington, DC 20528;

**Lee Francis Cissna**, in his official capacity as
**Director of U.S. Citizenship and Immigration
Services,**
20 Massachusetts Avenue NW
Room 4210, MS: 2120
Washington, DC 20529;

Civil Action No. _____

**CLASS COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

**Kevin K. McAleenan**, in his official capacity as
**Commissioner of U.S. Customs and Border
Protection,**
1300 Pennsylvania Avenue NW
MS: 1345
Washington, DC 20229;

**Ronald D. Vitiello**, in his official capacity as **Acting
Director of Immigration and Customs Enforcement**,
500 12th Street NW
Washington, DC 20536;

**James McHenry**, in his official capacity as **Director
of the Executive Office for Immigration Review,**
U.S. Department of Justice
5107 Leesburg Pike
Falls Church, VA 22041;

**U.S. Department of Justice,**
950 Pennsylvania Avenue NW,
Washington, DC 20530;

**U.S. Department of Homeland Security,**
245 Murray Lane SW
Mailstop 0485
Washington, DC 20528;

**U.S. Citizenship and Immigration Services,**
20 Massachusetts Avenue NW
Washington, DC 20529;

**U.S. Customs and Border Protection,**
1300 Pennsylvania Avenue NW
Washington, DC 20229;

**U.S. Immigration and Customs Enforcement,**
500 12th Street SW
Washington, DC 20530;

**Executive Office for Immigration Review**;
U.S. Department of Justice
5107 Leesburg Pike
Falls Church, VA 22041;

Defendants.

## INTRODUCTION

1.     Plaintiffs Capital Area Immigrants' Rights Coalition ("CAIR Coalition"), Refugee and Immigrant Center for Education and Legal Services, Inc. ("RAICES"), and S.M.S.R. and R.S.P.S., on behalf of themselves and a class of all others similarly situated (collectively, "Plaintiffs"), bring this lawsuit to challenge the Government's categorical bar on asylum eligibility for individuals and families entering the United States outside approved ports of entry along the southern border.

2.     Our immigration laws, consistent with the United States' international agreements, reflect Congress's commitment to aid persons fleeing persecution regardless of their point of entry: "[a]ny alien who is physically present in the United States or who arrives in the United States," "whether or not at a designated port of arrival" and "irrespective of such alien's status," has the right to apply for asylum. 8 U.S.C. § 1158(a)(1).

3.     On November 9, 2018, directly countermanding that and other statutory guarantees, and without using the notice and comment procedures required by the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, the Acting Attorney General and Secretary of Homeland Security issued an interim final rule (the "Rule") providing that any individuals subject to a presidential proclamation restricting entry through the southern border pursuant to Immigration and Nationality Act ("INA") § 212(f), 8 U.S.C. § 1182(f), or INA § 215(a)(1), 8 U.S.C. § 1185(a)(1), are ineligible for asylum. *See Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55,934 (Nov. 9, 2018).

4.     The next day, the President signed a Proclamation[1] suspending the entry of all persons entering the United States without inspection at the southern border with Mexico.

5.     Taken together, the Rule and Proclamation create an unlawful "mandatory bar on eligibility for asylum," 83 Fed. Reg. 55,939, that operates against many of those who need it most: migrants fleeing persecution and violence across the southern border of the United States. Such asylum seekers are disproportionately comprised of women, children, LGBT individuals, and other vulnerable populations at risk of violence in their home countries.

6.     Plaintiffs respectfully ask the Court to issue an order declaring that the Rule and Proclamation violate the INA, the APA, and the Constitution, and enjoining their enforcement and implementation across the United States.

7.     Because Plaintiffs S.M.S.R. and R.S.P.S. are at risk of deportation, and Plaintiffs RAICES and CAIR Coalition also will suffer irreparable harm absent an injunction against the Rule, Plaintiffs are moving for a temporary restraining order and a preliminary injunction contemporaneously with filing this Complaint.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the U.S. Constitution, the INA, the APA, and other federal statutes.

9.     The Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the APA, 5 U.S.C. § 706; the Mandamus and Venue Act, 28 U.S.C. § 1361; Rules 23, 57, and 65 of the Federal Rules of Civil Procedure ("Federal Rules"); and the Court's inherent equitable powers.

---

[1] "Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States" 83 Fed. Reg. 57,661 (Nov. 9, 2018) (the "Proclamation").

10.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2), (e)(1).  Upon information and belief, a substantial part of the events giving rise to this claim occurred in this District, including the decision to implement the policy changes challenged in this action.  Each individual Defendant also is an officer of the United States sued in his or her official capacity, and the majority of Defendants reside in this District.

11.     To the extent that Plaintiffs' claims constitute "[j]udicial review of determinations under [8 U.S.C. § 1225(b)] and its implementation," jurisdiction and venue also are proper under 8 U.S.C. § 1252(e)(3).

## PARTIES

12.     Plaintiff S.M.S.R. is a young mother from Honduras seeking asylum in the United States.  S.M.S.R. fled Honduras in October 2018 with her minor son, R.S.P.S., because members of the Mara Salvatrucha ("MS-13") gang repeatedly attacked R.S.P.S. and threatened to kill both him and S.M.S.R. on at least four occasions in the past eight months.  The gang members threatened to kill them because of S.M.S.R.'s refusal to live with the gang as their "wife," and R.S.P.S.'s refusal to join the gang.  S.M.S.R. told the gang that she could not act as their "wife" because of her Evangelical Christian beliefs.

13.     Based on past observation, information, and belief, the police in Honduras would not help S.M.S.R. or her son if they reported MS-13's violence and threats against them.  S.M.S.R. has seen police officers receiving payments from gang members and greeting gang members in a friendly way, despite having received reports of gang-related murders in the area.  S.M.S.R. also cannot be safe in other areas of Honduras, because MS-13 took pictures of her and told her they would find her.

14.     S.M.S.R. decided to flee Honduras with her son the day after the most recent death threat that they received from MS-13 gang members in early October 2018.  S.M.S.R. and R.S.P.S. entered the United States without inspection on November 10, 2018, and were quickly detained by U.S. immigration officials.

15.     On November 16, 2018, at the detention center in Dilley, Texas, S.M.S.R. received an orientation in which she was provided with information about what a credible fear interview was.  She was interviewed by an Asylum Officer on November 19, 2018.  After S.M.S.R. indicated that she had entered outside a port of entry on November 10, 2018, the Asylum Officer told S.M.S.R. that she had entered the United States illegally and was ineligible for asylum based on a presidential proclamation. The Asylum Officer further told S.M.S.R. that she was not eligible for a credible fear interview, and that the purpose of the rest of the interview was to determine if she had a reasonable fear of persecution or torture.  S.M.S.R. was confused about what constitutes a "reasonable fear" and did not receive any orientation on what a reasonable fear interview was, or why she could not apply for asylum in the United States.

16.     Plaintiff R.S.P.S., the minor son of S.M.S.R., is a boy from Honduras seeking asylum in the United States.  R.S.P.S. fled Honduras in October 2018 with his mother, S.M.S.R., because members of the MS-13 gang repeatedly attacked R.S.P.S. and threatened to kill both him and S.M.S.R. on at least four occasions in the past eight months.  The gang members threatened to kill them because of S.M.S.R.'s refusal to live with the gang as their "wife," and R.S.P.S.'s refusal to join the gang.  R.S.P.S. cannot do the things that the gang told him he would have to do—including using drugs and beating up and killing people—because of his Evangelical Christian beliefs.

17.     Members of MS-13 have attacked R.S.P.S. three times, leaving him with a scar on his hand and bruises covering his chest and arm.  The day before R.S.P.S. and his mother left Honduras, gang members told him that the next time they saw him they would not "warn" him again, and would kill him and his mother.

18.     Based on past observation, information, and belief, the police in Honduras would not help R.S.P.S. or his mother if they reported MS-13's violence and threats against them.  In R.S.P.S.'s experience, the police have failed to respond to numerous gang-related murders reported in his neighborhood in Honduras.  R.S.P.S. also has seen police officers ignore gang members using drugs in front of them.

19.     R.S.P.S. entered the United States without inspection on November 10, 2018 with his mother, and they were quickly detained by U.S. immigration officials.  R.S.P.S. was briefly questioned by the Asylum Officer following his mother's interview on November 19, 2018.  R.S.P.S. told the Asylum Officer about three incidents of violence he had experienced from MS-13 gang members and that there is nowhere he and his mother could safely live in Honduras.

20.     If they are returned to Honduras, both S.M.S.R. and R.S.P.S. fear persecution in the form of torture or death by MS-13 gang members.

21.     Plaintiff CAIR Coalition is a 501(c)(3) nonprofit legal services and advocacy organization with its principal place of business in the District of Columbia.  CAIR Coalition provides direct legal services to migrant men, women, and children at risk of detention and deportation in the Washington, DC metropolitan area and beyond, including with respect to credible fear interviews in the course of removal procedures, asylum applications, and adversarial proceedings in immigration courts.  The organization also engages in impact and advocacy work related to immigration and trains and supervises pro bono attorneys.

22.     Plaintiff RAICES is a 501(c)(3) nonprofit legal services and advocacy organization with offices in San Antonio, Austin, Corpus Christi, Dallas, Fort Worth, and Houston, Texas.  Founded in 1986 as the Refugee Aid Project, RAICES has grown to become the largest immigration legal services provider in Texas.   The organization provides consultations and direct legal services to immigrants and refugees in Texas, as well as to clients after they leave the state.  In 2017 alone, RAICES staff closed 51,000 cases at no cost to its clients.

23.     Defendant Donald J. Trump is the President of the United States.  On November 9, 2018, he issued the Proclamation.  He is sued in his official capacity.

24.     Defendant Matthew Whitaker is sued in his official capacity as the putative Acting Attorney General of the United States.   The Attorney General is responsible for administering the U.S. immigration laws pursuant to 8 U.S.C. § 1103, and has the authority to grant noncitizens asylum and other relief.  He also directs each of the component agencies within Defendant U.S. Department of Justice.   Whitaker was Acting Attorney General when the Department of Justice issued the Rule challenged in this action.

25.     Defendant Kirstjen Nielsen is sued in her official capacity as the Secretary of the U.S. Department of Homeland Security.  In that capacity, she is responsible for administering the U.S. immigration laws pursuant to 8 U.S.C. § 1103, has the authority to grant noncitizens asylum and other relief, and issued the Rule challenged in this action.  She also directs each of the component agencies within Defendant U.S. Department of Homeland Security.

26.     Defendant L. Francis Cissna is sued in his official capacity as the Director of U.S. Citizenship and Immigration Services.  In that capacity, he is responsible for overseeing asylum

officers who adjudicate applicants' asylum claims, including by conducting "credible fear" interviews pursuant to 8 U.S.C. § 1225(b)(1)(B).

27.     Defendant Kevin K. McAleenan is sued in his official capacity as the Commissioner of U.S. Customs and Border Protection.  In that capacity, he oversees the agency responsible for securing U.S. borders with respect to trade, immigration, and agricultural protection.

28.     Defendant Ronald Vitiello is sued in his official capacity as the Acting Director of U.S. Immigration and Customs Enforcement.  In this capacity, he is responsible for civil and criminal enforcement of federal laws governing border control, customs, trade, and immigration.

29.     Defendant James McHenry is sued in his official capacity as the Director of the Executive Office for Immigration Review.  In that capacity, he is responsible for the sub-agency of the U.S. Department of Justice that conducts limited review of negative credible fear determinations made pursuant to 8 U.S.C. § 1225(b)(1)(B).

30.     Defendant U.S. Department of Justice ("DOJ") is a cabinet-level department of the federal government responsible for enforcement of the laws of the United States.

31.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the federal government responsible for enforcing the immigration laws of the United States.  Its component sub-agencies include Defendant U.S. Citizenship and Immigration Services, Defendant U.S. Customs and Border Protection, and Defendant U.S. Immigration and Customs Enforcement.

32.     Defendant U.S. Citizenship and Immigration Services ("USCIS") is the sub-agency of DHS responsible for conducting interviews of asylum applicants through its asylum officers.

33.     Defendant U.S. Customs and Border Protection ("CBP") is the sub-agency of DHS responsible for the initial processing and detention of noncitizens who are apprehended at or near U.S. borders.

34.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is the sub-agency of DHS responsible for carrying out removal orders and overseeing immigration detention in the United States.

35.     Defendant Executive Office for Immigration Review ("EOIR") is a sub-agency of DOJ. *See* 28 C.F.R. § 0.115. It is responsible for conducting limited review of negative credible fear determinations made pursuant to 8 U.S.C. § 1225(b)(1)(B).

## BACKGROUND

### Asylum Protections under International and Domestic Law

36.     Under existing federal law, and consistent with the United States' international obligations, individuals fleeing persecution and violence are entitled to pursue several forms of legal protection in the United States.

37.     These forms of protection include (1) asylum, 8 U.S.C. § 1158; (2) withholding of removal, 8 U.S.C. § 1231(b)(3); and (3) protection under the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. § 208.18.

38.     Modern asylum procedures initially were established in the Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102, which revised the INA's procedures for admission of refugees and announced that "it is the policy of the United States to encourage all nations to provide assistance

and resettlement opportunities to refugees to the fullest extent possible," *id.* § 101(a) (codified as Note to 8 U.S.C. § 1521).

39.     In creating the asylum provisions, Congress sought to bring the United States into compliance with its international obligations under the 1967 United Nations Protocol Relating to the Status of Refugees and the 1951 Convention Relating to the Status of Refugees.   These and other international treaties reflect the United States' obligations to permit refugees to seek asylum in its borders, to impose no penalties on asylum-seekers based on the unlawful status, and to prevent the return (or "refouler") of individuals to countries where they would face persecution or torture.

40.     In particular, Article 31(1) of the Optional Protocol provides that "[t]he Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence."   Article 33(1) of the 1951 Convention Relating to the Status of Refugees and the Optional Protocol "imposed a mandatory duty on contracting States not to return an alien to a country where his 'life or freedom would be threatened'" on account of race, religion, nationality, membership in a particular social group, or political opinion.   *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 429 (1987) (quoting 189 U.N.T.S. 150, 176 (1954)).

41.     "Congress imbued these international commitments with the force of law when it enacted the Refugee Act of 1980," and when it subsequently passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, "which refashioned the above principles into their current form" in the INA.   *R-S-C v. Sessions*, 869 F.3d

1176, 1178 (10th Cir. 2017). This "refashioning" in the INA included the modern prohibition on withholding of removal as to individuals threatened on account of race, religion, nationality, social group membership, or political opinion, 8 U.S.C. § 1231(b)(3)(A), 8 C.F.R. § 1208.16, and the guarantee that all noncitizens may apply for asylum on the same grounds, 8 U.S.C. § 1158(a)(1). *See R-S-C*, 869 F.3d at 1178.

42.     Specifically, Congress made clear that all noncitizens may apply for asylum, regardless of how or where they entered into the United States.   In particular, 8 U.S.C. § 1158(a)(1) provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival* and including an alien who is brought to the United States after having been interdicted in international or United States waters), *irrespective of such alien's status*, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1) (emphases added).[2]

43.     Asylum may be granted to an individual who has a "well-founded fear of persecution" on the same five grounds enumerated in our international agreements: "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(1)(A); *id.* § 1101(a)(42)(A).

44.     An applicant's testimony is sufficient to sustain her burden to prove such well-founded fear without corroboration if it "is credible, is persuasive, and refers to specific facts" sufficient to demonstrate that asylum may be warranted. *Id.* § 1158(b)(1)(B)(ii). A ten percent chance of harm is sufficient to establish a "well-founded fear." *Cardoza-Fonseca*, 480 U.S. at 440; *see, e.g.*, *Bartolome v. Sessions*, 904 F.3d 803, 809 (9th Cir. 2018).

---

[2] The Board of Immigration Appeals has held that "an alien's manner of entry or attempted entry . . . should not be considered in such a way that the practical effect is to deny [asylum] relief in virtually all cases." *Matter of Pula*, 19 I. & N. Dec. 467, 473 (BIA 1987).

45.     There are three principal ways in which individuals may seek asylum:

a.      First, where a noncitizen is not in any kind of removal proceedings, her application is "affirmative." *See* 8 C.F.R. § 208.2(a). She files an application with Defendant USCIS and has an interview with an asylum officer. *Id.* §§ 208.3, 208.4, 208.9.

b.      Second, a noncitizen in ordinary removal proceedings under INA § 240, 8 U.S.C. § 1229a, may file a "defensive" application in order to prevent her removal, 8 C.F.R. § 208.2(b).

c.      Third, a noncitizen in "expedited removal" proceedings under INA § 235, 8 U.S.C. § 1225—which apply to certain noncitizens who arrive at ports of entry or are apprehended after entering without inspection, *see id.* § 1225(b)(1)[3]—also may seek asylum to prevent her removal. If the individual indicates an intention to apply for asylum or a fear of persecution during the expedited removal process, she is entitled to a "credible fear" screening interview with an asylum officer. *Id.* § 1225(b)(1)(B). If the officer finds she has a "credible fear of persecution," defined as a "significant possibility" that the alien could establish eligibility for asylum, she is then placed in ordinary removal proceedings under INA § 240 and permitted to apply for asylum as part of that process. *Id.*; 8 C.F.R. § 208.30(f). If the officer finds that the individual does not have a credible fear, the officer must provide her with a written notice of decision for review by an immigration judge. 8 C.F.R. § 208.30(g).

46.     Withholding of removal separately offers protection to individuals facing persecution on the same five grounds for which asylum is available (race, religion, nationality, membership in a particular social group, or political opinion), 8 U.S.C. § 1231(b)(3)(A), and the

---

[3] *See also Designating Aliens for Expedited Removal*, 69 Fed. Reg. 48,877 (Aug. 11, 2004) (expedited removal applies to those who entered without inspection and are apprehended within 14 days of entry and 100 miles of the border).

domestic implementing legislation for the CAT offers individuals protection against return to countries where they are likely to be tortured,[4] *see* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105–277, § 2242(b) (requiring implementation of CAT); 8 C.F.R. § 208.18.

47.     Noncitizens can obtain withholding of removal and CAT relief in different ways, each of which is defensive:

    a.     Noncitizens can raise withholding of removal and CAT relief as defenses to ordinary removal proceedings. *See* 8 U.S.C. § 1231(b)(3). The applicant must demonstrate that it "is more likely than not that he would be subject to persecution on one of the [protected] grounds." *Ling Huang v. Holder*, 744 F.3d 1149, 1152 (9th Cir. 2014). Similarly, to obtain CAT relief, an applicant must demonstrate that it is "more likely than not that he or she would be would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).

    b.     Alternatively, Defendant DHS has provided by regulation that aliens who are ordered removed because they committed aggravated felonies, 8 U.S.C. § 1228, or whose removals are reinstated because they entered unlawfully after a valid removal order, 8 U.S.C. § 1231, may avoid removal by showing a "reasonable fear" of persecution. 8 C.F.R. §§ 208.31(b), 1280.31(b). To establish such a "reasonable fear" an individual must establish "a reasonable possibility that he or she would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal." 8 C.F.R. §§ 208.31(c),

---

[4] As the Rule recognizes, "[f]ewer than 1,000 aliens per year, of any nationality, receive CAT protection." 83 Fed. Reg. 55,947.

1208.31(c).[5]  Individuals who show such a reasonable fear are referred to an immigration judge

for full consideration of withholding of removal. *Id.* §§ 208.31(e), 1208.31(e).[6]

48.     The INA does not authorize a noncitizen to seek withholding of removal or CAT

relief in expedited removal proceedings outside of these circumstances, and there is no

"reasonable fear" screening process for noncitizens subject to expedited removal.   Such

noncitizens only need to show a "credible fear" of persecution or torture to advance to

proceedings under INA § 240, in which they may raise claims for asylum, withholding of

removal, or CAT relief.

49.     The INA imposes eligibility restrictions on asylum that it does not impose on

withholding of removal and CAT relief. *See* 8 U.S.C. § 1158(b)(1)(A).

50.     Congress made a variety of benefits available to those who obtain asylum,

including a path to U.S. citizenship after being lawfully admitted for permanent residence. *See*

*id.* §§ 1159(b), 1427.

51.     The spouse and children of a person eligible for asylum likewise are derivatively

eligible for asylum. *Id.* § 1158(b)(3)(A).

---

[5] "'[T]he standard for showing entitlement to these forms of protection (a probability of persecution or torture)'" thus "'is significantly higher than the standard for asylum (a well-founded fear of persecution).'"  83 Fed. Reg. 55,942 (quoting Regulations Concerning the CAT, 64 Fed. Reg. 8,485); *see also id.* ("'This . . . screening process is modeled on the credible-fear screening process, but requires the alien to meet a higher screening standard.'").

[6] If an asylum officer concludes that the individual does not present a reasonable fear and requests further review, an immigration judge performs a brief de novo review of the asylum officer's decision.   8 C.F.R. §§ 208.31(g), 1208.31(g); Immigration Court Practice Manual, ch. 7.4(e)(iv)(E).  If the immigration judge concurs with the asylum officer, the case is returned to USCIS for removal proceedings without further administrative appeal.   8 C.F.R. §§ 208.31(g)(1), 1208.31(g)(1).   If the immigration judge disagrees, an application for withholding of removal and CAT relief is permitted. *Id.* §§ 208.31(g)(2), 1208.31(g)(2).

52.    These status adjustment and family eligibility benefits are not available in connection with other forms of relief for those fleeing persecution and violence, such as withholding of removal and CAT protection.

### Individuals and Families Seeking Asylum at the Southern Border

53.    Individuals like Plaintiffs S.M.S.R. and R.S.P.S. who arrive at the southern border seeking asylum in the United States, are often fleeing some of the most dangerous countries in the world.

54.    Many hail from El Salvador, Guatemala, and Honduras, often referred to collectively as the "Northern Triangle."  According to a recent report from the United Nations High Commissioner for Refugees, these countries are experiencing epidemic levels of violence at the hands of "well-connected, armed, and dangerous criminal groups in the region," which have utterly "surpassed the governments' capacity to respond."[7]

55.    In particular, violence against women by armed groups has escalated dramatically throughout Central America in recent years, and those governments have failed to provide effective protection.[8]

56.    As of 2016, El Salvador, Guatemala, and Honduras ranked first, third, and seventh, respectively, for rates of female homicides.[9]

57.    In some instances, government actors have been charged with participating in such violence.  For example, following a March 2017 protest against sexual violence and

---

[7] *See Women on the Run: First-Hand Accounts of Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico* at 58, UNHCR (Oct. 2015), https://goo.gl/6hVsam; *see also Neither Security nor Justice: Sexual and Gender-based Violence and Gang Violence in El Salvador, Honduras, & Guatemala*, KIND (2017).

[8] *Anjali Fleury, Fleeing to Mexico for Safety: The Perilous Journey for Migrant Women*, United Nations University (May 4, 2016), https://goo.gl/f8dspH.

[9] *Women on the Run* at 2, *supra*.

physical abuse at a Guatemalan government-run children's shelter, 56 girls were locked inside the shelter and 41 died in a fire, for which state officials were charged.[10]   Plaintiff R.S.P.S. recalls seeing a news report about another instance in which the Honduran police killed a boy with a gun, and people subsequently asking why the police were killing citizens instead of helping them.

58.     Violence against children likewise is prevalent in the region.  As one example, Honduras is a particularly dangerous place for young people: In 2017, it was listed as the single most violent country for children under nineteen years old, with a homicide rate of more than thirty children per 100,000 inhabitants (about ten times the global average).[11]

59.     In particular, two rival gangs (MS-13 and the 18th Street Gang) fight for control over territory and recruit in urban and rural areas of Honduras.[12]   These gangs often target children like Plaintiff R.S.P.S. as their weapons of war, because national anti-gang legislation carries less severe penalties for minors involved in gang activity than for adults.[13]   These young recruits are often forced to collect "taxes" or sell drugs, and those who refuse are often killed,[14] while law enforcement officers frequently regard them as potential criminals or gang members.[15]

---

[10] Fatema Z. Sumar, *Violence Against Women in Central America is a Powerful Factor in the Migration Crisis (*Nov. 8, 2018); Andrew V. Pestano, *Guatemala charges officials over shelter fire that killed 41 girls*, UPI (Apr. 5, 2017), https://goo.gl/Zg1D86.
[11] Parker Asmann, *Ten Countries with Highest Child Homicide Rates All in LatAM:  Report*, InSight Crime (June 6, 2017), https://goo.gl/UC1Ea5.
[12] *See, generally*, *Gangs in Honduras*, InSight Crime (Apr. 21, 2016), https://goo.gl/oL6nFn.
[13] Honduras, Country Reports on Human Rights Practices for 2016 at 28, U.S. Dep't of State (2016), https://goo.gl/7MpCCM.
[14] *Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions on his Mission to Honduras* at 6, U.N. Human Rights Council, A/HRC/35/23/Add.1 (June 2017).
[15] *Id.* at 14.

60.     Corruption among Honduran law enforcement also has been widely reported; some police officers themselves work with the gangs, compounding the dangers to citizens.[16]

61.     Reports of violence against gay, lesbian, bisexual, and transgender (LGBT) individuals in the Northern Triangle countries also are overwhelming, and frequently ignored by state governments.[17] The United Nations High Commissioner for Refugees found in the course of a study that 88% of LGBT asylum seekers and refugees from the Northern Triangle reported having suffered sexual and gender-based violence in their home countries.[18]

62.     According to the Honduran non-governmental organization Cattrachas, 264 LGBT individuals were killed in that country between 2009 and 2017; in most cases, those responsible were never brought to justice.[19]

63.     According to Amnesty International, the "high levels of impunity and corruption in [Northern Triangle] countries mean authorities are unlikely to punish those responsible for crimes against LGBT people, particularly when security forces are responsible for the attacks."[20]

64.     In sum, individuals like Plaintiffs S.M.S.R. and R.S.P.S. fleeing to the United States' southern border, and particularly from the Northern Triangle countries, often are running from life-or-death situations, leaving behind all they have to make a dangerous journey.

65.     Many of these individuals have legitimate claims for asylum in the United States. According to data published by the United Nations High Commissioner for Refugees, in

---

[16] Sarah Chayes, *When Corruption is the Operating System: The Case of Honduras* at 29, Carnegie Endowment for International Peace (May 2017), https://goo.gl/nUFicM ("Of greater concern are the reports we heard in interviews of collusion between police and the youth gangs whose depredations it is their job to curb.").

[17] *See Women on the Run* at 27-30, *supra*.

[18] *No Safe Place*, Amnesty Int'l at 7 (Nov. 2017), https://goo.gl/dNTUNm.

[19] *No Safe Place: LGBTI Salvadorans, Guatemalans and Hondurans Seeking Asylum in Mexico* (Nov. 27, 2017), https://goo.gl/79cG3H.

[20] *Id.*

Fiscal Year 2015, 82% of the women from El Salvador, Guatemala, Honduras, and Mexico who were subject to credible fear screenings by asylum officers in the United States were found to have a significant possibility of establishing eligibility for asylum or protection under the CAT.[21]

66.     In a similar 2014 report, the United Nations High Commissioner for Refugees found that 58% of unaccompanied children interviewed from the Northern Triangle countries and Mexico were "forcibly displaced because they suffered or faced harms that indicated a potential or actual need for international protection."[22]

67.     Perhaps the most telling indicator of the extreme risks of persecution and violence faced by asylum seekers is the fact that they are willing to endure a dangerous journey to the United States for an opportunity to press their asylum claims.

68.     Asylum seekers are at risk of kidnapping, disappearance, trafficking, and sexual assault, among other harms, along their journey.  Migrant females are particularly vulnerable. Data published by Amnesty International estimates that 60% of women and girls are raped while migrating across Mexico, and the estimates of some service providers are higher.[23]

69.     The so-called migrant "caravans" that began making their way to the United States in late 2018 also have included as many as 2,300 children who were exposed to inclement weather, dangerously hot temperatures, and limited access to proper shelter, leading some to fall ill or suffer serious effects of dehydration.[24]

---

[21] *See Women on the Run* n.2, UNHCR, https://goo.gl/6hVsam.

[22] *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection* at 6, UNHCR (2014), https://goo.gl/p3TGrW.

[23] Alyson L. Dimmitt Gnam, *Mexico's Missed Opportunities to Protect Irregular Women Transmigrants: Applying a Gender Lens to Migration Law Reform*, 22 Pac. Rim L. & Pol. J. 713, 722 (2013); *see also Invisible Victims: Migrants on the Move in Mexico* at 5, Amnesty International (2010),  https://goo.gl/Bvs1RM.

[24] *An estimated 2,300 children traveling with migrant caravan in Mexico need protection and essential services*, UNICEF (Oct. 26, 2018), https://goo.gl/2r6Q1M.

70.     While crossing Mexico to reach the United States itself carries risks, some migrants report that asylum claims have been more difficult to prove to Mexican authorities, that they did not have enough information about protections in Mexico, or that conditions in Mexico are sufficiently dangerous that seeking asylum there would not improve their safety.[25]  Plaintiff S.M.S.R., for example, had been told by friends and others that seeking asylum in Mexico would be impossible.

71.     Rates of violence in Mexico also have been increasing, with more than 23,000 murder investigations opened in 2017 (the highest count on record).[26]  Plaintiff S.M.S.R. felt unsafe on numerous occasions while traveling through Mexico with her son.

### Obstacles and Risks at Southern Border Ports of Entry

72.     Upon arrival at the southern border, entry through an approved port is infeasible for many asylum seekers.  Some asylum seekers are unaware that approved ports of entry exist. In other cases, approved ports of entry are difficult to access, causing migrants to attempt unauthorized border crossings.  Plaintiff S.M.S.R., for example, had been told that entering the United States through an approved port of entry would be difficult.

73.     Defendant CBP engages in a well-documented practice of "metering," in which "officers only allow the asylum-seeker to cross the [international] line if space is available" in the port of entry.[27]  "When the ports of entry are full, CBP guidance states that officers should

---

[25] *Fleury, Fleeing to Mexico for Safety: The Perilous Journey for Migrant Women, supra.*
[26] *Mexico murders hit record high, dealing blow to president,* Reuters (Dec. 23, 2017), https://goo.gl/524yFF.
[27] *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy,* OIG-18-84 at 6, U.S. Office of Inspector Gen. (Sept. 27, 2018).

inform individuals that the port is currently at capacity and that they will be permitted to enter once there is sufficient space and resources to process them."[28]

74.     Advocates have documented substantial delay times and long lines at approved ports of entry such as Nogales, Arizona; El Paso and McAllen, Texas; and San Diego, California.[29]  Families may be camped out in heat exceeding 100 degrees.[30]

75.     At one point this year, the Nogales, Arizona port of entry had 113 individuals waiting their turn to present themselves for asylum.   Only six asylum seekers were being processed each day, and the port had a holding capacity of only 47 people.[31]

76.     Advocates further reported instances in which CBP officers turned asylum seekers away by claiming "we're not doing asylum here" or telling migrants the port of entry is "full."[32]

77.     Left stranded while waiting for backlogs at ports of entry to clear, asylum seekers are particularly vulnerable to kidnapping, extortion, and other violence by organized crime elements in northern Mexico.[33]  Crossing the border outside of an approved port of entry can become a safety imperative in these circumstances.

78.     A September 2018 report by the U.S. Office of Inspector General ("OIG") found that asylum seekers were "turned away at some of the ports of entry" that it inspected, and stated that a CBP official had reported that backlogs at ports of entry caused by metering directives and

---

[28] *Id.*

[29] Adam Isacson et al., *"Come Back Later": Challenges for Asylum Seekers Waiting at Ports of Entry* at 2-3, Washington Office on Latin Am. (Aug. 2018), https://goo.gl/euGQyY.

[30] *Id.* at 3.

[31] *Id.* at 5.

[32] *Id.*

[33] *Id.* at 7; *see also Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers* at 1, Human Rights First (May 2017), https://goo.gl/4dmTia.

the Administration's "Zero Tolerance Policy" "likely resulted in additional illegal border crossings."[34]

79.      OIG concluded that "[w]hile the stated intentions behind metering may be reasonable, the practice may have unintended consequences. For instance, OIG saw evidence that limiting the volume of asylum-seekers entering at ports of entry leads some aliens who would otherwise seek legal entry into the United States to cross the border illegally."[35]

80.      OIG reported that "[a]ccording to one Border Patrol supervisor, the Border Patrol sees an increase in illegal entries when aliens are metered at ports of entry."[36]

81.      Likewise, "[t]wo aliens recently apprehended by the Border Patrol corroborated this observation, reporting to the OIG team that they crossed the border illegally after initially being turned away at ports of entry. One woman said she had been turned away three times by an officer on the bridge before deciding to take her chances on illegal entry."[37]

82.      By late November 2018, the Government's "metering" practices had contributed to a backlog of thousands of migrants waiting to attempt entry near Tijuana.[38] The Mexican government opened an open-air sports complex about a mile from the U.S. border to house these migrants while Defendants processed an estimated forty asylum applications per day.[39] Migrants reported lack of food and water at the facility, as well as exposure to rain and mud.[40]

---

[34] *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* at 6 n.13.

[35] *Id.* at 7.

[36] *Id.*

[37] *Id.*

[38] *See* Rick Jervis, *How a policy shift may have led to the border confrontation with the migrant caravan*, USA Today (Nov. 28, 2018), https://goo.gl/4gBRCc.

[39] *Id.*

[40] *Id.*

83.     After customs officials reported that they did not expect to process asylum applications for recently-arrived "caravan" members for five to six weeks, migrants organized a peaceful protest near the Tijuana border crossing on November 25, 2018.[41]   The group of protesters, which included women and young children, was dispersed by CBP agents using tear gas and pepper spray.[42]

### The Government's Escalating Responses to Southern Border Migration

84.     Notwithstanding the dire conditions in many Central American countries, the rate of illegal border crossings is substantially down from its peak.

85.     The number of migrants arrested at the southern border for attempting to cross unlawfully is at its lowest level since 1971: For Fiscal Year 2017, Defendant CBP reported 310,531 such arrests, down from 1,676,438 in 2000.[43]   The 2017 figures represented a 25% decrease since 2016 alone.[44]

86.     Nonetheless, Defendants have targeted southern border asylum seekers in recent months with exceptionally strict policies and unlawful regulations.

87.     In April 2018, the Administration announced a new "Zero Tolerance" policy on immigration, pursuant to which the Government began separating detained migrant parents and their children.[45]

---

[41] *Id.*

[42] *Id.*

[43] John Burnett, *Arrests for Illegal Border Crossings Hit 46-Year Low*, NPR (Dec. 5, 2017) https://goo.gl/xqqjTo; *CBP Border Security Report, Fiscal Year 2017*, CBP (Dec. 5, 2017), https://goo.gl/k2wmia.

[44] *Id.*

[45] *Attorney Gen. Announces Zero-Tolerance Policy for Criminal Illegal Entry*, DOJ (Apr. 6, 2018), https://goo.gl/sdsvQP; *see also Attorney Gen. Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Admin.*, DOJ (May 7, 2018), https://goo.gl/ihRX79 ("If you are smuggling a child, then we will prosecute you and that child will be separated from you as required by law.").

88.     Following immense public opposition and political pressure, the "Zero Tolerance" family separation policy was withdrawn by Executive Order for an indefinite period on June 20, 2018.[46]

89.     On June 26, 2018, the U.S. District Court for the Southern District of California issued a preliminary injunction enjoining the Government from unlawfully detaining migrant parents without and apart from their children, and ordered the Government to reunite separated families within thirty days, absent a determination of parental unfitness or danger to the child.[47]

90.     On November 15, 2018, following additional legal challenges, the Government entered a class Settlement Agreement, approved by the U.S. District Court for the Southern District of California, that requires Defendants to, *inter alia*, reconsider the asylum claims of classes of migrant parents and children who were unlawfully separated.[48]

91.     In the months preceding the issuance of the challenged Rule, President Trump repeatedly asserted fears of an asylum-seeking "caravan" thousands of miles from the border.

92.     Among other such statements, President Trump tweeted that individuals would "have to apply for asylum in Mexico first, and if they fail to do that, the U.S. will turn them away."[49]   On October 31, 2018, the President tweeted a video that contained inflammatory

---

[46] Exec. Order No. 13,841, *Affording Congress an Opportunity to Address Family Separation*, 83 Fed. Reg. 29,435 (June 25, 2018).

[47] *Ms. L v. U.S. Immigration & Customs Enforcement ("ICE")*, 310 F. Supp. 2d 1133, 1149 (S.D. Cal. 2018).

[48] *Id.;* Dkt. 321, Case No. 18-cv-0428 DMS (MDD) (S.D. Cal.)  (Order Certifying Settlement Class and Granting Final Approval of Class Action Settlement) (Nov. 15, 2018); *id.* Dkt. 220-1 (Plan to address the asylum claims of class-member parents and children who are physically present in the United States) (Sept. 12, 2018).

[49] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 21, 2018, 12:11 PM EDT), https://goo.gl/6Hx5Eb.

footage depicting an immigrant convicted of murdering police officers followed by a migrant "caravan" breaking past a wall."[50]

93.     President Trump soon after indicated that he intended to sign an executive order restricting asylum.

### The Rule and Proclamation

94.     On November 9, 2018, Defendant Whitaker, in his capacity as Acting Attorney General, and Defendant Nielsen, in her capacity as Secretary of Homeland Security, promulgated the Rule pursuant to 8 U.S.C. §§ 1158(b)(2)(C), (d)(5)(B), which give the Attorney General the power to establish by regulation "additional limitations and conditions, *consistent with this section*, under which an alien shall be ineligible for asylum," and "any other conditions or limitations on the consideration of an application for asylum *not inconsistent with this chapter*" (emphases added).

95.     As set forth above, the INA already guarantees "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status" the right to "apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1).

96.     The Rule imposes a "new mandatory bar on eligibility for asylum" for "aliens who are subject to a presidential proclamation suspending or imposing limitations on their entry into the United States pursuant to section § 212(f) of the INA, 8 U.S.C. § 1182(f), or section §

---

[50] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 31, 2018, 1:18 PM EDT), https://goo.gl/cH9MD7.  The video was denounced by numerous Republican elected officials.

215(a)(1) of the INA, 8 U.S.C. § 1185(a)(1), and who enter the United States in contravention of such a proclamation after the effective date of this rule." 83 Fed. Reg. 55,939.

97.     The bar is effected through changes to 8 C.F.R. § 208.13 (aliens ineligible for asylum if, in relevant part, they are the subject of a presidential proclamation under INA §§ 212(f), 215(a)(1)); *id.* § 1208.13 (same); *id.* § 208.30 (asylum officers shall enter negative credible fear findings with respect to asylum applications and refer individuals for proceedings under INA § 240 on withholding of removal and CAT claims); *id.* § 1003.42 (establishing limited *de novo* review procedures by immigration judges regarding determination that individuals are subject to exclusion under 8 C.F.R. §§ 208.13(c)(3), 1208.13(c)(3)); *id.* § 1208.30 (same, and establishing limited *de novo* review procedures by immigration judges regarding negative reasonable fear determinations).

98.     The "mandatory bar" applies "prospectively, to aliens who enter the United States after the effective date of such a proclamation," and where a presidential proclamation concerns entry at "the southern border."   It does not apply in the event that a proclamation expressly disclaims effects on asylum eligibility or contains applicable waivers or exceptions.   83 Fed. Reg. 55,939; 8 C.F.R. §§ 208.13, 1208.13.

99.     The Rule's public notice confirms that the rule does not limit the ability of individuals to be considered for withholding of removal or CAT protections, 83 Fed. Reg. at 55,947, both of which require satisfaction of the higher "reasonable fear" standard.

100.     Accordingly, for any individual subject to the new "mandatory bar," an asylum officer "shall enter a negative credible fear determination with respect to the alien's application for asylum" and "place the alien in proceedings under section 240 of the Act" to consider her

claim for withholding of removal or protection under the CAT "if the alien establishes a reasonable fear of persecution or torture." 8 C.F.R. § 208.30.

101.    If such an individual fails to establish a reasonable fear of persecution or torture during her interview with an asylum officer, that officer is to provide her a notice of decision subject to limited review by an immigration judge, who likewise will apply the heightened "reasonable fear" standard rather than the "credible fear" standard. *Id.*

102.    According to Procedural Guidance issued by USCIS,[51] "aliens cannot be placed in proceedings before an immigration judge to determine whether they are entitled to statutory withholding or CAT protection by showing a mere *significant possibility* that they would be persecuted or tortured" under the credible fear standard.[52]  In addition, whereas unaccompanied children previously received special non-adversarial proceedings in which to present their claims for asylum, those children will now be summarily informed that they are ineligible for asylum, and compelled to undergo the same withholding-of-removal process as adults.[53]

103.    On November 9, 2018, the day after the Rule was first announced, President Trump issued the Proclamation pursuant to 8 U.S.C. §§ 1182(f), 1185(a).  The Proclamation immediately suspended "[t]he entry of any alien into the United States across the international boundary between the United States and Mexico," applicable to aliens who enter the country after the date of the Proclamation and outside approved ports of entry.  Proc. §§ 1, 2(a)-(b).

---

[51] Some asylum officers reported to news outlets that they received an email copy of USCIS's guidance memorandum only on Friday night—or not at all—although the agency was to begin processing cases under the new regulation on Saturday, November 10, 2018.  Dara Lind*, Some asylum officers say they never got the memo about Trump's asylum ban*, Vox (Nov. 9, 2018), https://goo.gl/pBhrZy.

[52] L. Francis Cissna, *Procedural Guidance for Implementing Regulatory Changes Created by Interim Final Rule, Aliens Subject to a Bar on Entry under Certain Presidential Proclamations; Procedures for Protection Claims* at 4, USCIS (Nov. 9, 2018), https://goo.gl/AEjzzW (emphasis in original).

[53] *Id.* at 6.

104.     The suspension prescribed in the Proclamation will expire ninety days after its effective date or the date on which an agreement permits the United States to "remove aliens to Mexico" under the terms of INA § 208(a)(2)(A), 8 U.S.C. § 1158(a)(2)(A), whichever is earlier.

105.     Together, the Rule and Proclamation rendered immediately ineligible for asylum all noncitizens who enter the United States without inspection at the southern border.

106.     The Rule and Proclamation claim, by their own terms, that this policy change is needed to respond to a "crisis on the southern border."   83 Fed. Reg. 55,947; *see also* Proc. at 1.

107.     The public notice for the Rule, like President Trump's earlier public announcements, invokes "the prospect that large caravans of thousands of aliens, primarily from Central America, will seek to enter the United States unlawfully or without proper documentation" in the near future.  83 Fed. Reg. 55,947.

108.     The Proclamation likewise cites concerns regarding impending "large numbers of aliens traveling through Mexico to enter our country unlawfully or without proper documentation," who "would add tremendous strain to an already taxed system, especially if they avoid orderly processing by unlawfully crossing the southern border."  Proc. at 1.

109.     To date, however, the migrant "caravan" that has arrived has proceeded largely to approved ports of entry, particular at the border with Tijuana, Mexico.

110.     As numerous news outlets reported, "[t]he vanguard of what President Trump has labeled an invasion force formed an orderly line at about 6:45 a.m. on Thursday [November 15, 2018] near a major border crossing between Tijuana and the United States and waited patiently" to present largely asylum claims.[54]

---

[54] Kirk Semple, *Dozens From Migrant Caravan Line Up at Border, Seeking Asylum Interviews*, New York Times (Nov. 15, 2018), https://goo.gl/KpG2AX.

111.   Among them, at least "[a]bout 80 lesbian, gay, bisexual and transgender people" "had come to the crossing, with stories of victimization and persecution, to make appointments for asylum interviews in the United States."[55]

112.   The public notice for the Rule claims that it will, in combination with the Proclamation, "help ameliorate the pressures on the present system" for apprehending, detaining, and evaluating the claims of migrants and "have a deterrent effect that could lessen future flows of illegal immigration." 83 Fed. Reg. 55,947-55,948. The rule explicitly seeks to "reduce the number of cases referred to section 240 proceedings."[56] 83 Fed. Reg. at 55,947.

113.   However, notwithstanding the rule's purported efficiency objectives, the Government recognizes that "screening for proclamation-based ineligibility for asylum may in some case entail some additional work." *Id.*

114.   For example, Defendant USCIS provided estimates that asylum officers historically average four to five credible fear interviews and completions per day, but only two to three reasonable fear case completions per day. *Id.* The Proclamation therefore "might result in the need to increase the number of officers required" to complete credible fear or reasonable fear screenings consistent with current case completion goals, and "additional interviewing time might be necessary." *Id.*

115.   In addition, DHS expects to "expend additional resources detaining aliens who would have previously received a positive credible-fear determination and who now receive, and challenge, a negative credible-fear and reasonable-fear determination." *Id.* Because individuals are eligible for parole or release if they establish a credible fear, "[t]o the extent that the rule may

---

[55] *Id.*
[56] The Rule's public notice recognizes that "[o]nce aliens are referred for section 240 proceedings, their cases may take months or years to adjudicate due to backlogs in the system." 83 Fed. Reg. at 55,945.

result in lengthier interviews for each case, aliens' length of stay in detention would increase." *Id.*

116.    DHS also anticipates that, to the extent the rule will increase the number of migrants receiving negative credible fear and reasonable fear determinations and thus be subject to immediate removal, "DHS will incur increased and more immediate costs for enforcement and removal of these aliens." *Id.* at 55,948.

117.    Defendants further acknowledge that "in the event all of the approximately 70,000 aliens per year who cross illegally and assert a credible fear instead decide to present at a port of entry, processing times at ports of entry would be slower in the absence of additional resources or policies that would encourage alien so enter at less busy ports." *Id.* 55,949.  For example, using figures from Fiscal Year 2018, the number of migrants presenting at approved ports of entry would rise from about 124,511 to approximately 200,000.  *Id.*

118.    Upon information and belief, no additional resources or policies have been dedicated to encouraging migrants to enter the United States at less busy ports or to augmenting the staffing of busier ports.

119.    In addition, the APA generally requires advance public notice and comment on proposed regulations, including the publication of a proposed substantive rule at least thirty days before its effective date.   5 U.S.C. §§ 553(b)-(d).   The Rule was not published prior to its adoption by Defendants or subjected to advance public notice and comment procedures.

120.    On November 19, 2018, in a case brought by the American Civil Liberties Union ("ACLU") challenging the Rule and Proclamation, the U.S. District Court for the Northern District of California issued a temporary restraining order enjoining the implementation of the Rule nationwide. *East Bay Sanctuary Covenant, et al. v. Trump, et al.*, Case No. 18-cv-06810,

2018 WL 6053140, at *21 (N.D. Cal. Nov. 19, 2018). The court concluded that the plaintiffs were likely to succeed on the merits of their claims, *see id.* at *10-17, that the organizational plaintiffs "made a clear showing that it is likely that they and their clients will suffer irreparable harm absent a TRO," *id.* at *19, and that the public interest and balance of equities favor an injunction against the Rule, *id.* at *19-20.

121.    The Northern District of California's temporary restraining order is to remain in effect until December 19, 2018 or further order of the court. *Id.* at *21. A hearing was set for December 19, 2018 for defendants to show cause why they "should not be enjoined from taking any action continuing to implement the Rule and ordered to return to the pre-Rule practices for processing asylum applications" pending final disposition of the case. *Id.*

122.    On November 27, 2018, the Government moved the U.S. District Court for the Northern District of California for an emergency stay of its temporary restraining order. *East Bay Sanctuary Covenant*, Case No. 18-cv-06810, Dkt. 52 (N.D. Cal. Nov. 27, 2018). The court denied the Government's request on November 30, 2018. *Id.* Dkt. 61.

123.    The Government also filed a Notice of Appeal on November 27, 2018. *Id.* Dkt. 51. On December 1, 2018, the Government moved the U.S. Court of Appeals for the Ninth Circuit for an emergency administrative stay and stay pending appeal of the district court's temporary restraining order. *East Bay Sanctuary Covenant, et al. v. Trump, et al.*, Case No. 18-17274, Dkt. 4 (9th Cir. Dec. 1, 2018). In a docket order issued on the same date, the Ninth Circuit motions panel denied the Government's request for an immediate administrative stay and called for briefing on the Government's request for a stay pending appeal to be completed by December 4, 2018.

## Harms to Individual Plaintiffs

124.    Absent an injunction, the Rule will cause immediate and irreparable harm to Plaintiffs S.M.S.R., R.S.P.S., and the other putative class members who are fleeing dangerous conditions in their home countries and seeking asylum in the United States.

125.    As noted above, on November 16, 2018, Plaintiff S.M.S.R. received an orientation at a detention center in Dilley, Texas.  Based on this orientation, she understood that she would be permitted to apply for asylum and would receive a "credible fear" interview.

126.    On November 19, 2018, S.M.S.R. was interviewed by an Asylum Officer.  During her interview, S.M.S.R. confirmed to the Asylum Officer that she was testifying on behalf of herself and her son, R.S.P.S., and that she and her son wanted R.S.P.S. to be included in her claim for asylum protection.

127.    After S.M.S.R. indicated that she had crossed the southern border outside a port of entry, the Asylum Officer told her that, under the Rule and Proclamation, she was ineligible for asylum because she had entered the United States outside of a port of entry.  The Asylum Officer also explained that S.M.S.R. would no longer have a "credible fear" interview based on the Proclamation.  The officer informed her that the purpose of the interview would be to determine if she had a "reasonable fear" of persecution or torture, despite the fact that S.M.S.R. had never received an orientation regarding a reasonable fear interview.

128.    R.S.P.S. also was interviewed for "reasonable fear" at that time.  His mother was present for some, but not all, of his interview questioning.

129.    Plaintiffs S.M.S.R. and R.S.P.S. received supervised release from detention into the community a few days later, pending further proceedings.

130.    Absent an injunction, the implementation and enforcement of the Rule will immediately and irreparably harm Plaintiffs S.M.S.R. and R.S.P.S., as well as other members of the putative class.  The Rule and Proclamation categorically will deprive Plaintiffs of eligibility for asylum regardless of the merits of their claims and significantly increase the risks that they will be forced to return to dangerous conditions in their home countries.

131.    For Plaintiffs S.M.S.R. and R.S.P.S., for example, implementation of the Rule will mean a significantly increased risk of forcible return to Honduras, where they have experienced, and would continue to face, ongoing threats of violence at the hands of MS-13 gang members who have pictures of S.M.S.R., vowed to find her if she relocated, and told R.S.P.S. he would not receive another warning before being killed with his mother for their refusals to affiliate with the gang.

### Harms to Organizational Plaintiffs

132.    Plaintiffs CAIR Coalition and RAICES are 501(c)(3) nonprofit organizations that provide assistance to asylum seekers, including individuals who crossed the southern border outside approved ports of entry and who file applications for asylum with Defendant USCIS. Absent injunctive relief, both organizations would be irreparably harmed by the Rule and Proclamation, which divert their human and financial resources and compromise their ability to serve their client populations consistent with their organizational missions.

133.    Plaintiff CAIR Coalition is a 501(c)(3) nonprofit organization dedicated to providing legal services to migrant men, women, and children who are detained by ICE or the Office of Refugee Resettlement ("ORR") in Virginia and Maryland.  CAIR Coalition assists clients with applications for asylum, preparing for credible fear interviews, and adversarial

proceedings in immigration courts.   CAIR Coalition also trains and supervises legal professionals to provide similar assistance.

134.   Asylum applications are a critical component of CAIR Coalition's organizational mission.   Each year, CAIR Coalition serves hundreds of clients seeking asylum who entered the United States at the southern border in places other than ports of entry ("non-POE asylum seekers").

135.   The Rule, if not enjoined, will irreparably frustrate CAIR Coalition's mission to serve as many migrants lawfully seeking asylum as possible.   Because Defendant DHS will summarily deport many non-POE asylum seekers before they reach the Washington, DC metropolitan area, CAIR Coalition will face a drastic reduction in its client base.

136.   The Rule and Proclamation also will substantially limit the overall number of clients CAIR Coalition can serve, whether or not those clients entered at a port of entry.   CAIR Coalition must create more complicated new resources and procedures to assist clients with their claims, in turn reducing how many clients the organization can reach.   The Rule and Proclamation put CAIR Coalition in a difficult position: raise more funds to serve the same number of clients, or reduce the number of clients served to fit within its current budget.

137.   For example, CAIR Coalition will be forced to divert significant staff resources to analyzing and interpreting the Rule and Proclamation, overhauling its client information database, and preparing new informational and advocacy materials.

138.   CAIR Coalition also will need to develop new materials and procedures for jail visits specifically for non-POE asylum seekers.   CAIR Coalition usually provides one orientation for all detainees, regardless of how they entered the country.   Under the Rule and Proclamation, however, CAIR Coalition must develop a separate orientation for non-POE asylum seekers to

explain the different standard for their credible fear interview and the limited forms of relief available, double the number of staff to conduct two orientations, and spend more staff time on the longer, more complicated dual orientation.

139.   Under the Rule and Proclamation, CAIR Coalition also will expend more resources to prepare each non-POE asylum seeker for his or her credible fear interview.  During the approximately 1,500 intake sessions for detained adults that CAIR Coalition conducts each year, a CAIR Coalition staff member typically spends about five to ten minutes with each adult eligible for such interview preparing them for their credible fear interview.

140.   Under USCIS guidance regarding the Rule and Proclamation, non-POE asylum seekers effectively will need to meet the higher "reasonable fear" standard rather than the traditional "credible fear" standard to obtain relief.  To prevail in a reasonable fear interview, an individual must show effectively at least a 51% chance—i.e., that they "more likely than not"— will be persecuted or tortured in their home country.  In contrast, in a credible fear interview, an individual must show an approximately 10% chance—i.e., that they have a "well-founded fear"—of persecution or torture in their home country.  It is much more difficult for migrants to receive a positive determination in a reasonable fear interview.  During 2018, only 62% of reasonable fear interviews CAIR Coalition was involved with received positive determinations, compared to 87% for credible fear interviews.

141.   As a result of the heightened "reasonable fear" standard, each preparation session for a non-POE asylum seeker will take roughly twice the amount of time, roughly ten to twenty minutes per client, whether to elicit and prepare more facts to satisfy the higher standard or related to follow-up interviews.  The Rule and Proclamation thus would cut in half the number of clients CAIR Coalition can prepare during each jail visit.  And with finite resources and

permission to make jail visits only a few times a month, CAIR Coalition will be unable to compensate for this loss.

142.    CAIR Coalition will spend more resources during credible fear interviews for adult non-POE asylum seekers, too.  Prior to the Rule and Proclamation, CAIR Coalition had stopped sending staff and volunteers to credible fear interviews in person because the overwhelming majority of clients received positive results.  Instead, CAIR Coalition generally would review the transcripts from interviews with negative determinations.

143.    Because the Rule and Proclamation increase the standard for the interviews, it will be important to send staff and volunteer attorneys to as many interviews as possible to increase the likelihood that each client will pass.  If CAIR Coalition staff members are busy attending these interviews, they will be unable to assist as many clients in trial proceedings under INA Section 240.

144.    Given the increased burden of proof that will be required at interviews, CAIR Coalition also anticipates that it will not be able to staff interviews with legal assistants or law student volunteers, as it sometimes has in the past.

145.    CAIR Coalition also will need to recreate its now-defunct volunteer program for attending credible fear interviews as a result of the higher standard.  Because of the Rule and Proclamation, CAIR Coalition already has discussed hiring another dedicated attorney or legal assistant to recruit and train volunteer lawyers to sit in on credible fear interviews.

146.    The increased need for volunteer lawyers has a ripple effect on the rest of CAIR Coalition's programs.  Attorneys volunteering to attend credible fear interviews will have less time—or perhaps no more time—available to volunteer in other cases.  This reduced volunteer

capacity reduces the organization's overall capacity to represent as many clients as possible, especially in trial proceedings.

147.   Reduced volunteer capacity also will divert resources from other of CAIR Coalition's initiatives, such as providing translations or conducting country conditions research.

148.   The Rule and Proclamation also will force CAIR Coalition to spend more time and resources on each child client, because all child cases will be time- and resource-intensive trial cases.   Because the Rule and Proclamation prevent non-POE asylum seekers, including children, from obtaining asylum, their cases bypass the normal Asylum Office process and move directly to trial at immigration court.

149.   CAIR Coalition's staff members will have to prepare for trial rather than an interview at the Asylum Office.   And staff members who work with detained children will have less time available to work on each case, as the detained docket moves much faster than the timeframe at the Asylum Office.

150.   Under the Rule and Proclamation, CAIR Coalition will have to spend more time and resources on cases for young mothers and their children as well.   Each year, CAIR Coalition serves about twenty to thirty mothers and their immigrant children who live in shelters.   CAIR Coalition anticipates that, under the new Rule and Proclamation, it will have to significantly increase the total time that must be spent on each family's case, because the mothers will be ineligible for asylum and their children unable to be counted as derivatives within a single application for relief.

151.   The Rule and Proclamation also will jeopardize CAIR Coalition's already tight budget.   CAIR Coalition depends on law firms for 12% of its annual budget; if the organization

places fewer asylum cases with volunteers at law firms, it is likely to receive fewer of these much-needed donations.

152.   In addition, some of CAIR Coalition's funding is tied to the number of adult clients that it serves each year.  At the Caroline County, Virginia detention center, for example, CAIR Coalition receives funding to serve a targeted number of detained adults in trial proceedings each year.  The increased time it takes CAIR Coalition to serve each asylum seeker correspondingly reduces the overall numbers of people served.  As a result, it is uncertain whether CAIR Coalition will be able to comply with its existing funding conditions tied to numbers of trial representations.

153.   The Rule's lack of notice and comment procedures also irreparably compromised CAIR Coalition's ability to inform the Government of the substantial and irreparable harms— both to the organization and its clients—that the policy would create.  Commenting on rules and regulations is an important part of CAIR Coalition's mission to improve the lives of migrants in the Washington, D.C. area.  Had CAIR Coalition been given the opportunity to comment on the Rule, it would have done so.

154.   RAICES is a 501(c)(3) nonprofit organization headquartered in San Antonio, Texas.

155.   Founded in 1986 as the Refugee Aid Project by community activists in South Texas, RAICES has grown to be the largest immigration legal services provider in Texas. RAICES is a 501(c)(3) nonprofit organization headquartered in San Antonio, Texas, with other offices in Austin, Corpus Christi, Dallas, Fort Worth, and Houston.  RAICES's mission is to promote justice by providing free and low-cost legal services to underserved migrant children,

families, and refugees in Texas.  In 2017, RAICES staff closed approximately 51,000 cases at no cost to the client.

156.    Since January 1, 2018, approximately 70% of the detained migrant families, and 50% of the detained unaccompanied minors served by RAICES were non-POE asylum seekers. Honduras, Guatemala, and El Salvador are the primary home countries for the non-POE asylum seekers whom RAICES serves.

157.    Absent an injunction, the Rule and Proclamation will irreparably harm RAICES in multiple ways, including by frustrating RAICES's mission to serve as many migrant clients as possible.  RAICES will be unable to represent the same number of clients that it does currently, both because fewer clients will be eligible for relief and because RAICES will spend more resources on each individual case.  The Rule and Proclamation also will force RAICES to divert scarce resources away from other important programs to compensate for the additional time, procedures, and staff required to continue serving clients under the policy.

158.    The Rule and Proclamation will fundamentally reduce the capacity and divert the resources of RAICES's Family Detention Services program, which will need to devise entirely new intake procedures at each of the detention centers it serves.  Currently, the intake process is relatively short.  Since January 1, 2018, Family Detention Services has conducted at least 7,000 intakes.  Under the Rule and Proclamation, however, RAICES staff will need to conduct more extensive and time-consuming intake questioning of each client.  In particular, RAICES will need to ascertain whether the client attempted to enter through a port of entry and whether he or she is likely to meet the higher legal standards for alternative forms of relief.

159.    The Rule and Proclamation also will require Family Detention Services to create an entirely new process for assisting non-POE asylum seekers with their credible fear interviews.

For example, Family Detention Services currently assists most detainees at the detention facility in Karnes, Texas with their credible fear interviews.  Since January 1, 2018, approximately 2,700 families underwent credible fear interviews.

160.    Pro bono attorneys and law students often attend these interviews telephonically so that staff can focus on difficult or emergency cases.  Since June 2018, RAICES staff represented at approximately 40 interviews, while volunteers represented at approximately 359 interviews.

161.    Under the Rule and Proclamation, however, Family Detention Services will be forced to create a more time- and resource-intensive dual-track system to prepare clients for interviews: one for clients who entered at ports of entry or before the effective date of the Rule and Proclamation—i.e., using the traditional preparation methods—and another entirely new system for non-POE asylum seekers.

162.    Under the Rule and Proclamation, the shift from credible to reasonable fear interviews will be a significant one for Family Detention Services.  The reasonable fear standard is much more difficult to meet than the credible fear standard.  Since January 1, 2018, only about 65% of our clients in reasonable fear interviews received positive determinations, compared to 95% for clients in credible fear interviews.

163.    The program's staff will spend double or triple the time interviewing and preparing each client to meet the higher reasonable fear standard.  Due to the higher stakes, more staff will need to attend interviews, rather than relying on volunteers.  For the pro bono attorneys that still could attend, Family Detention Services will need to create new training resources on how to make legal arguments that were rarely necessary during previous credible fear interviews.

And no law students will be able to attend these interviews at all, drastically reducing the program's volunteer base.

164.    In contrast to the credible fear standard, the higher reasonable fear standard will require Family Detention Services to prepare each child for an interview.  Children are more likely to be required to testify in a reasonable fear rather than a credible fear interview.  Thus, Family Detention Services will have explain the process and prepare each child for questioning. This generally at least doubles—with a corresponding increase depending on the size of the family—the time to prepare each family for their interviews.

165.    As a result of the Rule and Proclamation and the foregoing resource-shifting, Family Detention Services might not be able to provide any assistance at credible fear interviews for asylum seekers unaffected by the policy.

166.    Family Detention Services also will struggle under the weight of increased appeals under the Rule and Proclamation.  These appeals are time-consuming for staff, who must prepare the client to testify and research legal arguments for immigration court.   Family Detention Services will need to narrow its case acceptance criteria as the volume of appeals increases, further undermining the program's commitment to universal representation.

167.    Nor will Family Detention Services be able to rely on pro bono attorneys to represent clients in immigration court; unlike with telephonic credible fear interviews, few pro bono attorneys are available to represent clients in person at immigration court, especially in rural Texas.

168.    The Rule and Proclamation also create new burdens for RAICES's Children's Program.  Under the TVPRA, removal proceedings for unaccompanied minors applying for

asylum occur at the Asylum Office in a non-adversarial context, rather than in immigration court, to protect these vulnerable children.

169.    Under the Rule and Proclamation, however, unaccompanied minors who enter outside of a port of entry will no longer be eligible for asylum.  The Asylum Office will have no jurisdiction over the case; an Immigration Judge will hear the case for withholding of removal and protection under CAT.  What has been a non-adversarial process using minimal resources therefore will become a lengthy and costly process for the Children's Program.  Staff will have to prepare formal briefings and sophisticated legal arguments for an Immigration Judge, both of which are uncommon for Asylum Office proceedings.

170.    The adversarial process in immigration court is also a traumatic one for the children.  Under the Rule and Proclamation, Children's Program staff will expend tremendous time and resources preparing children not only for the contents of their testimony and cross-examination by a DHS attorney, but also for the emotional toll that testimony would take.

171.    The Rule and Proclamation will add new obstacles for RAICES's Community Immigration Services program as well, which assists clients after they have been released from detention.  Last year, Community Immigration Services worked with approximately 100 asylum-seeking clients outside detention.  Staff assisted with roughly 75 applications.

172.    Under the Rule and Proclamation, Community Immigration Services will spend at least double the traditional time on each family's applications.  Because each individual will have to submit a separate application, rather than one application per family, it will take significantly more time and resources for Community Immigration Services lawyers to assist families with their applications than before the policy.  RAICES anticipates that, under the

Interim Rule and Proclamation, Community Immigration Services would need to assist with at least twice the current number of applications.

173.    Community Immigration Services staff also may have to shift roles into other RAICES programs.  If fewer clients are released from detention under the higher reasonable fear standard, Community Immigration Services lawyers will have a decreased population to serve. Family Detention Services and the Children's Program, conversely, will be understaffed due to the increased burdens created by the Rule and Proclamation.  RAICES will need to retrain Community Immigration Services staff to perform unfamiliar duties for other programs.

174.    The Rule's lack of notice and comment procedures also irreparably compromised RAICES's ability to inform the Government of the substantial harms—both to the organization and its clients—that the policy would create.  Commenting on rules and regulations is an important part of RAICES's mission to improve the lives of migrants in Texas.  In 2018, RAICES has commented on four proposed rules and regulations.  Had RAICES been given the opportunity to comment on the Rule, it would have done so.

## CLASS ACTION ALLEGATIONS

175.    S.M.S.R. and R.S.P.S. bring this lawsuit challenging the Rule and Proclamation individually and on behalf of a proposed nationwide class under Federal Rules 23(b)(2) and 23(c)(4), consisting of all noncitizens who have entered or will enter the United States through the southern border but outside ports of entry at any time on or after November 9, 2018.

176.    The prerequisites of Federal Rule 23(a) are satisfied.  The proposed class consists of hundreds of migrants detained or released into the community pending further immigration proceedings throughout the United States, rendering it impracticable to join all class members before the Court.  Fed. R. Civ. P. 23(a)(1).  There also are substantial questions of law or fact

common to all class members, including whether the Defendants' actions in promulgating and

enforcing the Rule and Proclamation violate the laws and Constitution of the United States. *Id.*

23(a)(2), (c)(4).   S.M.S.R.'s and R.S.P.S.'s claims will be typical of those of the class, and

S.M.S.R. and R.S.P.S. will fairly and adequately protect the class's interests. *Id.* 23(a)(3)-(4).

177.    Defendants have acted or refused to act on grounds that apply generally to the

class, such that the requested declaratory and injunctive relief is appropriate respecting the class

as a whole. *Id.* 23(b)(2).   All class members had the right to apply for asylum under the U.S.

immigration laws prior to the promulgation of the Rule and Proclamation.

## CAUSES OF ACTION

### COUNT I

### (Substantive Violation of INA, 8 U.S.C. § 1158, and APA, 5 U.S.C. § 706)

178.    Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs

as though fully set forth herein.

179.    The APA requires courts to hold unlawful and set aside any agency action that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary

to constitutional right, power, privilege, or immunity;" "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right;" and "without observance of procedure

required by law." 5 U.S.C. §§ 706(2)(A)-(C).

180.    The INA guarantees "[a]ny alien who is physically present in the United States or

who arrives in the United States (*whether or not at a designated port of arrival* and including an

alien who is brought to the United States after having been interdicted in international or United

States waters), irrespective of such alien's status" the right to "apply for asylum in accordance

with this section or, where applicable, section 1225(b) of this title."   8 U.S.C. § 1158(a)(1) (emphasis added).

181.    In promulgating the Rule and implementing it in conjunction with the Proclamation, Defendants have acted contrary to the INA.

182.    Further, the Rule impermissibly empowers the President, rather than the Attorney General, to establish limitations on asylum unilaterally.   Section 1158(b)(2)(C) states that "[t]he Attorney General" may "establish . . . limitations and conditions" on asylum eligibility.   But the Rule purports to transfer that power to the President alone.   That purported delegation would allow an end-run around the requirements of the APA.

183.    The Rule exceeds the Attorney General's scope of delegated authority to establish "consistent" limitations and conditions on asylum eligibility and consideration of applications under 8 U.S.C §§ 1158(b)(2)(C), (d)(5)(B).   In addition to contravening the plain terms of 8 U.S.C. § 1158(a)(1), the Rule introduces a limit on the availability of asylum that is dramatically different from the other restrictions on asylum specified in the statute itself.

184.    The President's authority under 8 U.S.C. §§ 1182(f), 1185(a)(1) does not encompass the ability to override statutory requirements related to asylum.

185.    Through their actions described in this Complaint, Defendants have violated the substantive requirements of the INA and APA.   Defendants' violations inflict immediate and irreparable harm upon all Plaintiffs, including by denying S.M.S.R., R.S.P.S., and other putative class members the opportunity to seek asylum under the laws of the United States, depriving them of the benefits to which asylees are entitled, and exposing them to the risk of forcible return to dangerous conditions in their home countries.

186.    Plaintiffs lack adequate remedies at law to address Defendants' violations and seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy and practices alleged herein.

## COUNT II

### (Violation of APA, 5 U.S.C. § 706, through Arbitrary and Capricious Action)

187.    Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

188.    The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

189.    In promulgating the Rule and implementing it in conjunction with the Proclamation, Defendants have acted arbitrarily and capriciously. The Rule lacks any rational or evidence-based relationship to its proffered rationale of reducing the Government's expenditure of resources to detain and remove unlawful aliens.

190.    There also is no evidence that the Rule will "have a deterrent effect that could lessen future flows of illegal immigration," 83 Fed. Reg. 55,948, given the exigencies and administrative delays that compel migrants, and especially asylum seekers, to pursue entry outside of approved ports.

191.    The Rule and Proclamation also change prior policy holding that unlawful entry is merely one consideration in asylum applications, rather than a categorical bar to eligibility. *See Pula*, 19 I. & N. Dec. 467, 473. The Rule and Proclamation lack any acknowledgement of this deviation from existing policy, fail to offer meaningful justifications for such change, create internal inconsistencies in the law, and do not represent reasoned agency action.

192.    Through their actions described in this Complaint, Defendants have acted arbitrarily and capriciously in violation of the APA.

193.    Defendants' violations inflict immediate and irreparable harm upon all Plaintiffs, including by denying S.M.S.R., R.S.P.S., and other putative class members the opportunity to seek asylum in the United States and placing them at risk of deportation to countries in which they are endangered.

194.    Plaintiffs lack adequate remedies at law to address Defendants' violations and seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy and practices alleged herein.

## COUNT III

**(Violation of APA, 5 U.S.C. § 553, for Failure to Follow Notice and Comment Procedures)**

195.    Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

196.    The APA requires courts to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

197.    The APA requires that agencies follow public notice-and-comment rulemaking procedures before promulgating regulations. *See* 5 U.S.C. §§ 553(b), (c). Defendants failed to provide notice and an opportunity for public comment on the Rule in any manner prior to its issuance on November 8, 2018.

198.    The APA also presumptively requires that a substantive rule be published "not less than 30 days before its effective date." *Id.* § 553(d). Defendants failed to publish the Rule, which affects asylum seekers' substantive rights under the INA, as required by this provision.

199.    The APA's notice and comment exceptions related to "foreign affairs function[s] of the United States," *id.* § 553(a)(1), and "good cause," *id.* § 553(d)(3), are inapplicable.

200.    Had the Rule been the subject of advance publication and notice-and-comment rulemaking under the APA, CAIR Coalition and RAICES would have submitted comments opposing its adoption.

201.    Defendants' violations inflict immediate and irreparable harm upon all Plaintiffs, who lack adequate remedies at law and seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy and practices alleged herein.

## COUNT IV

### (Due Process, U.S. Const. amend. V)

202.    Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

203.    "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (internal quotation omitted); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to . . . due process of law."). The Due Process Clause applies to Plaintiffs S.M.S.R. and R.S.P.S. and the other putative class members in the United States.

204.    Under the Rule and Proclamation, Defendants will deny Plaintiffs S.M.S.R. and R.S.P.S. and other putative class members access to the asylum procedures to which they are entitled, regardless of their point of entry, under the INA. *See* 8 U.S.C. § 1158(a)(1).

205.     In addition, "an alien who has unlawfully entered the United States has a Fifth Amendment procedural due process right to petition the government for political asylum and a statutory procedural due process right to a meaningful or fair evidentiary hearing." *Gutierrez-Rogue v. I.N.S.*, 954 F.2d 769, 772-73 (D.C. Cir. 1992) (citing *Maldonado-Perez v. I.N.S.*, 865 F.2d 328, 332-33 (D.C. Cir. 1989)) (internal quotation marks and brackets omitted).

206.     As discussed above, Plaintiffs S.M.S.R. and R.S.P.S. and other putative class members have been afforded no process or access to fair hearings through which to seek asylum under the Rule and Proclamation, due to the policy's categorical denial of eligibility for migrants who entered through the southern border outside approved ports of entry.   Denying Plaintiffs S.M.S.R. and R.S.P.S. and other putative class members any ability to be meaningfully heard on their asylum claims violates their Fifth Amendment rights to due process.

207.     In addition, because minor children are derivatively eligible to receive asylum where their parents obtain asylum, *see* 8 U.S.C. § 1158(b)(3)(A), Defendants' violations of the due process rights of S.M.S.R. and other adult members of the putative class likewise violate the due process rights of R.S.P.S. and other derivatively eligible children in the putative class.

208.     Defendants' due process violations inflict immediate and irreparable harm upon S.M.S.R., R.S.P.S., and other putative class members, including by denying them the opportunity to seek asylum in the United States and placing them at risk of deportation to countries in which they are endangered.

209.     Plaintiffs lack adequate remedies at law to address Defendants' violations and seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy and practices alleged herein.

## COUNT V

**(Substantive Violation of Trafficking Victims Protection Reauthorization Act, 8 U.S.C. § 1158(b)(3)(C), and APA, 5 U.S.C. § 706)**

210.    Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

211.    As noted above, the TVPRA amended the INA to provide specific asylum protections for children.  *See* 8 U.S.C. §§ 1158(b)(3)(C), 1232.

212.    Pursuant to the TVPRA, unaccompanied children who enter the United States without inspection generally are not subject to expedited removal.  *Id.* § 1232(a)(5)(D)(i). Instead, unaccompanied minors are placed in regular removal proceedings before Immigration Judges without having to pass credible fear interviews.  *Id.*

213.    Prior to reaching an Immigration Judge, an unaccompanied child presents her application for asylum to an Asylum Officer, who has "initial jurisdiction over any asylum application filed by an unaccompanied alien child" and can accept the application even for an unaccompanied child in removal proceedings.  *Id.* § 1158(b)(3)(C).  If the Asylum Officer denies the application, then the unaccompanied minor generally proceeds to present her application to the Immigration Judge, in addition to any other claims she may have for withholding of removal or CAT relief.  *See id.* § 1232(a)(5)(D).

214.    As addressed above, this sequencing, which permits unaccompanied minors to present asylum claims to Asylum Officers in the first instance, is designed to further the TVPRA's fundamental objective of protecting children.  It ensures that when unaccompanied minors first recount the difficult and potentially traumatic facts underlying their asylum claims, they do so in a non-adversarial setting, rather than in the context of trial proceedings including cross-examination by DHS attorneys.

215.     The Rule is directly contrary to the TVPRA.  Asylum Officers would be forced to issue negative findings on the asylum claims of unaccompanied children.  The Rule contravenes the specific process that Congress set up for unaccompanied children.

216.     Through their actions described in this Complaint, Defendants have violated the substantive requirements of the TVPRA and APA.  Defendants' violations inflict immediate and irreparable harm upon unaccompanied children in the putative class by depriving them of the opportunity to seek asylum under the laws of the United States, especially the procedural protections created in the TVPRA, and by exposing them to the risk of forcible return to dangerous conditions in their home countries.  Defendants' violations also inflict immediate and irreparable harm on RAICES and CAIR Coalition by compromising the services they can provide to unaccompanied minor clients and forcing them to drastically divert or redesign their children's services programs.

217.     Plaintiffs lack adequate remedies at law to address Defendants' violations and seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy and practices alleged herein.

## COUNT VI

### (Mandamus, 28 U.S.C. § 1361)

218.     Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

219.     Federal district courts have "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States, or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.

220.    A plaintiff may obtain a writ of mandamus where she has a clear right to the relief sought, the defendant has a duty to do the act in question, and no other adequate remedy is available. *Id.*

221.    Under the INA, "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status," has the right to "apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title."   8 U.S.C.  §  1158(a)(1). Defendants have a clear, nondiscretionary duty to permit noncitizens to make asylum claims regardless of their status and point of entry into the United States.

222.    The Rule and Proclamation contravene Defendants' duty to permit such claims and categorically deny S.M.S.R., R.S.P.S., and the other members of the putative class the ability to claim asylum, for which the new policy unlawfully makes them ineligible based on their point of entry into the United States.

223.    Plaintiffs have exhausted all other avenues of relief and have no other adequate remedy.

224.    Defendants' violations inflict immediate and irreparable harm upon all Plaintiffs, including by denying S.M.S.R., R.S.P.S., and other putative class members the opportunity to seek asylum in the United States and placing them at risk of deportation to countries in which they are endangered.

225.    Plaintiffs have a clear right to access the asylum procedures available under the INA, and Defendants have a non-discretionary duty to provide them access to those procedures. There is no adequate remedy to Defendants' violation, apart from ordering Defendants to carry

out their duties to permit asylum claims consistent with the terms of the INA.   Plaintiffs accordingly are entitled to mandamus relief.

## COUNT VII

### (Violation of 28 U.S.C. § 508 and the Appointments Clause)

226.    Plaintiffs re-allege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

227.    Under 28 U.S.C. § 508(a), "[i]n case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office."   If the Deputy Attorney General is not "available," the "Associate Attorney General shall act as Attorney General."   *Id.* § 508(b).   "The Attorney General may designate the Solicitor General and the Assistant Attorneys General, in further order of succession, to act as Attorney General."   *Id.*

228.    Defendant Whitaker was not the Deputy Attorney General, nor did he hold any other office in the Department of Justice in the line of succession, at the time the office of Attorney General became vacant.   His appointment to be Acting Attorney General therefore violates 28 U.S.C. § 508.

229.    The Federal Vacancies Reform Act of 1998 ("FVRA"), 5 U.S.C. § 3345, is not applicable.   First, the FVRA does not override the provisions of 28 U.S.C. § 508.   Second, Attorney General Jefferson B. Sessions was removed by President Trump.   The resulting vacancy thus could not be filled using the FVRA.   *See* 5 U.S.C. § 3345(a).

230.    The Appointments Clause of the Constitution, art. II, § 2, cl. 2, requires the President to obtain "the Advice and Consent of the Senate" before appointing principal "Officers of the United States."

231.    The Attorney General is a principal officer for purposes of the Appointments Clause. *See Morrison v. Olson*, 487 U.S. 654 (1988).

232.    President Trump did not obtain the Advice and Consent of the Senate before appointing Defendant Whitaker to be Acting Attorney General.   His appointment therefore violates the Appointments Clause.

233.    Because Defendant Whitaker's appointment is invalid, he lacked authority to issue the Rule, and the Rule is unlawful.   In addition, any future action taken by Defendant Whitaker affecting any individual Plaintiff, organizational Plaintiff, client of an organizational Plaintiff, or class member, is likewise invalid.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court:

a.    Declare that the Rule is unauthorized by, and contrary to, the Constitution and laws of the United States;

b.    Issue a temporary restraining order enjoining Defendants from implementing or enforcing the Rule across the nation;

c.    Issue a writ of mandamus requiring Defendants' compliance with the terms of the INA, including the requirement that they provide S.M.S.R., R.S.P.S.,   and the putative class access to credible fear interviews to pursue their asylum claims;

d.    Set an expedited hearing within fourteen days pursuant to Federal Rule 65(b)(2) to determine whether the temporary restraining order should be extended and a preliminary injunction should be issued;

e.    Determine that this action may be maintained as a class action pursuant to Federal Rules 23(b)(2) and 23(c)(4); direct that reasonable notice be provided to the class pursuant to Federal Rule 23(c)(2); declare that Plaintiffs are the representatives of the class; and declare that Plaintiffs' counsel are class counsel; and

f.    Award damages, attorney's fees, and any such additional relief as the interests of justice may require.

Dated: December 3, 2018

Respectfully submitted,

**HOGAN LOVELLS US LLP**

By: _____

| | |
|---|---|
| Manoj Govindaiah | Neal K. Katyal (Bar No. 462071) |
| Curtis F.J. Doebbler* | T. Clark Weymouth (Bar No. 391833) |
| RAICES, Inc. | Craig A. Hoover (Bar No. 386918) |
| 1305 N. Flores Street | Justin W. Bernick (Bar No. 988245) |
| San Antonio, TX 78212 | Colleen Roh Sinzdak* (Bar No. 1015344) |
| Telephone: (210) 222-0964 | Zachary W. H. Best (Bar No. 1003717) |
| Facsimile: (210) 212-4856 | Mitchell P. Reich* (Bar No. 1044671) |
| manoj.govindaiah@raicestexas.org | Elizabeth Hagerty (Bar No. 1022774) |
| curtis.doebbler@raicestexas.org | Kaitlin Welborn (Bar. No. 88187724) |

Manoj Govindaiah
Curtis F.J. Doebbler*
RAICES, Inc.
1305 N. Flores Street
San Antonio, TX 78212
Telephone: (210) 222-0964
Facsimile: (210) 212-4856
manoj.govindaiah@raicestexas.org
curtis.doebbler@raicestexas.org

*pro hac vice application forthcoming*

*Counsel for Plaintiff Refugee and Immigrant
Center for Education and Legal Services, Inc.*

Neal K. Katyal (Bar No. 462071)
T. Clark Weymouth (Bar No. 391833)
Craig A. Hoover (Bar No. 386918)
Justin W. Bernick (Bar No. 988245)
Colleen Roh Sinzdak* (Bar No. 1015344)
Zachary W. H. Best (Bar No. 1003717)
Mitchell P. Reich* (Bar No. 1044671)
Elizabeth Hagerty (Bar No. 1022774)
Kaitlin Welborn (Bar. No. 88187724)
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com
t.weymouth@hoganlovells.com
craig.hoover@hoganlovells.com
justin.bernick@hoganlovells.com
colleen.sinzdak@hoganlovells.com
zachary.best@hoganlovells.com
mitchell.reich@hoganlovells.com
elizabeth.hagerty@hoganlovells.com
kaitlin.welborn@hoganlovells.com

Thomas P. Schmidt*
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-5547
Facsimile: (212) 918-3100
thomas.schmidt@hoganlovells.com

*pro hac vice application forthcoming*

*Counsel for Plaintiffs*